LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net



**14 CV     3446**

RECEIVED
MAY 13 2014
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

JOEL THOME,

        Plaintiff,                        **COMPLAINT**

    -against-

THE ALEXANDER & LOUISA
CALDER FOUNDATION a/k/a
THE CALDER FOUNDATION,              Plaintiff demands trial by jury
ALEXANDER S.C. ROWER a/k/a        for all claims so triable.
SANDY ROWER,
SANDRA CALDER DAVIDSON,
SHAWN DAVIDSON,
PETER LIPMAN,
HOLTON ROWER,
GRYPHON ROWER-UPJOHN,
SEÁN SWEENEY,
JOHN DOES 1-5,

        Defendants.

---------------------------------------------------------------x

<u>TABLE OF CONTENTS</u>

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  SUBJECT MATTER JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . 8

III.  HISTORY OF THE STAGE SET. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  THE STAGE SET IS UNQUESTIONABLY AN AUTHENTIC CALDER. . . . . . 11

V.  PLAINTIFF'S DEALINGS WITH THE CALDER FOUNDATION. . . . . . . . . . . 13

VI.  THE STATE COURT LITIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VII.  PLAINTIFF'S RECENT ATTEMPTS TO ENTER THE MARKETPLACE. . . . 17

VIII.  DEFENDANTS' FLIP-FLOPS: AUTHENTIC AND THEN INAUTHENTIC. . 20

IX.  THE STORY OF *MOUNTAINS AND CLOUDS*. . . . . . . . . . . . . . . . . . . . . . . 23

X.  OTHER VICTIMS OF DEFENDANTS' CONSPIRACY.. . . . . . . . . . . . . . . . . . 25

XI.  ANTITRUST ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    1.  The Relevant Market. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    2.  Trade and Commerce. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    3.  Anti-Competitive Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XII.  PLAINTIFF HAS SUFFERED AN ANTITRUST
INJURY, AND HAS ANTITRUST STANDING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    1.  Antitrust Injury and Antitrust Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    2.  Plaintiff is an "Efficient Enforcer." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    3.  The Defendants' Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

FIRST CLAIM (Monopolization; Sherman Act, Sections 1 and  2; Clayton Act). . . . . . . . 41

SECOND CLAIM (Lanham Act). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

THIRD CLAIM (Donnelly Act; New York General Business Law § 340 *et seq.*). . . . . . . . 43

FOURTH CLAIM (Property Disparagement; Special Damages). . . . . . . . . . . . . . . . . . . 46

FIFTH CLAIM (New York General Business Law § 349). . . . . . . . . . . . . . . . . . . . . . . . . . 47

DEMANDS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Plaintiff JOEL THOME, by his attorneys, Law Office of Richard A. Altman, for his complaint against the defendants, alleges as follows:

## INTRODUCTION

1. This is an action for antitrust damages and other relief, pursuant to the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, the Clayton Act, 15 U.S.C. §§ 15 and 26, and the Lanham Act, 15 U.S.C. § 1051 *et seq*.

2. Plaintiff also alleges state law claims for violation of the New York State Donnelly Act (New York General Business Law § 340 *et seq*.), deceptive practices, and product disparagement.

3. The claims asserted herein arise out of a twenty-five year conspiracy of monopolization and restraint of trade engaged in by the defendants, the direct intent and effect of which is to deprive plaintiff of his ability and right to participate in a specific market and submarket, and to sell a valuable work of art which he owns.

4. The defendants have been engaged in this conspiracy of fraud, collusion and manipulation, in order to control for their own benefit, personal gain and aggrandizement their power over the market for the works of the renowned and much-loved artist Alexander Calder, who died in 1976.

5. The individual defendants, who are the trustees and officers of the defendant Calder Foundation, are the central actors in the conspiracy.

6. Defendants have complete control over the market for artworks by Calder, because the art market recognizes the Foundation as the sole authentication authority, and fears to deal in any putative works by Calder which have not been so authenticated.

7.  That fear is well-founded, and has been publicly expressed by dealers, collectors and auction houses, the main participants in that market, who have often acknowledged that they have no choice but to deal with defendants on the latter's terms.

8.  On information and belief, several defendants own personally many Calder artworks. They thus have an economic incentive to control that market to their own financial advantage, by artificially limiting the supply of such works.

9.  In effect, because of their monopoly, defendants are able to unilaterally determine whether a Calder is actually a Calder.  If they say that a Calder is not a Calder, for whatever reason, whether acting in good faith or bad, then the work of art becomes worthless and unsaleable, or, in the language of the market, "burned."

10.  Several of these defendants are also descendants and co-executors of the Calder estate, and thus have a conflict of interest with participants in the marketplace for Calder artworks.

11.  Defendants' actions have damaged and distorted the market for Calder artworks, and represent egregious violations of the public trust placed in them by virtue of the tax-exempt and educational status of the Calder Foundation.

12.  According to defendant Foundation's website, www.calder.org, the purpose of the Foundation is as follows:

> The Calder Foundation, a nonprofit 501(c)3 organization founded in 1987 by Alexander S. C. Rower and the Calder family, is dedicated to collecting, exhibiting, preserving, and interpreting the art and archives of Alexander Calder and is charged with an unmatched collection of his works. The purposes of the Foundation include the furtherance of public knowledge and appreciation for the visual arts; the conduct of research in art history and related subjects, and the

provision of the results of that research to the general public; and the provision of facilities and programs to assist the education and development of visual artists. The Foundation's projects include collaborating on exhibitions and publications, organizing and maintaining the Calder archives, examining works attributed to Calder, and cataloguing the artist's works. Over the past several years, the Calder Foundation has expanded its programming to include its own exhibitions, lectures, performances, and events on Calder as well as contemporary artists, including those whose work the Foundation supports through its biannual Calder Prize and the Atelier Calder residency program in Saché, France.

13.  The Foundation's website also says the following:

The Foundation has registered in its archive more than 22,000 works made by Calder. From monumental sculptures, mobiles, stabiles, paintings, and drawings, to lesser known works such as jewelry, furniture, and household tools, the Foundation documents the image, title, date, size, media, provenance, and publication and exhibition history for each work. Updates to these records continue daily with research and correspondence between more than 4,000 museums, collectors, dealers, auction houses, and scholars worldwide.

Owners of works attributed to Calder are encouraged to register their works in the archive and to update the Foundation with any changes to their collections.

14.  Plaintiff Joel Thome is one of the many victims of the defendants' conspiracy.

15.  Plaintiff is the sole owner of the last major work created by Calder before his death. According to knowledgeable art dealers, its estimated value is more than $2 million.

16.  Its history is well documented, and shows that the work was unquestionably fabricated under Calder's personal supervision and in accordance with his intentions and specifications.  It is thus a genuine Calder.

17.  In 1975 and 1976, plaintiff worked closely with Calder in its fabrication, and the artist expressed several times to plaintiff its personal importance to him.

18.  The work is a theatrical stage set.  It has four elements:  (a) a large steel sculpture composed of pieces which move;  (b) a version one-third smaller, (c) a maquette of the

sculpture, and (d) an archive of original documents.  These four items are collectively referred to herein as "the Stage Set."

19.  Solely because of the actions of defendants, plaintiff has been unable to sell the Stage Set outright, or pledge it for a loan, despite its great value, and binding offers to purchase it.

20.  The offers and loans have all been contingent upon the inclusion of the work in Calder's *catalogue raisonné*, a document over which these defendants have total control.[1]

21.  The objective evidence proves the authenticity of the Stage Set beyond any doubt whatsoever.  See IV, *infra* at 11.

22.  Rather than being guided by principles of scholarship, forensic analysis and artistic integrity, these defendants have maintained their monopoly position by creating a climate of fear among collectors and museums that at any moment, the Calder artworks which they own could arbitrarily be declared inauthentic and thus worthless.

23.  This monopoly position is widely acknowledged by an apprehensive art world.  A February 1997 article in ARTnews, *When is a Calder not a Calder?*, by Judd Tully, says the following:

> But the Calder Foundation is much more than a run-of-the-mill, low-profile institution created to perpetuate an artist's memory or assist younger artists. It has become a key player in the art world. Through its work on a Calder catalogue raisonné, it has sole authority to bestow or withhold the stamp of authenticity. Prospective buyers consider it critical because, given the high prices of Calder's work, any purchase made without the committee's seal of approval would involve enormous financial risk. "They have power over tremendous amounts of money,"

---

[1]  "A *catalogue raisonné* is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a *catalogue raisonné* serves to authenticate the work, while non-inclusion suggests that the work is not genuine."  *Kirby v. Wildenstein*, 784 F.Supp. 1112, 1113 (S.D.N.Y.1992)

says one important anonymous Calder collector, "and everybody is biting their fingernails and saying, 'Oh my God, what if [they] disqualif[y] this?' They're in total control."

"I cannot let a client purchase a Calder privately or at auction without confirming beforehand...that it is going to be in the *catalogue raisonné*," says Abigail Asher, a partner in the art advisory firm Guggenheim Asher Associates, who has bought several major Calders over the years. Asked how long her policy has been in effect, she answered, "Ever since Rio Nero." That assessment was echoed by virtually every dealer and artworld source contacted for this article.
(brackets in original; copy annexed as Exhibit A).

24. The reference in the quoted language to Rio Nero is to a court case involving the authenticity of a Calder sculpture by that name, *Greenberg Gallery, Inc. v. Bauman*, 817 F.Supp.167 (D.D.C.1993).

25. Since Calder's death in 1976, sales of his works of art have been of major importance in the multi-billion dollar market for modern and contemporary art. His sculptures and mobiles typically sell for millions of dollars. In 2012, a standing mobile by Calder titled "Lily of Force" sold at Christie's auction house for $18.5 million.

26. As a direct result of the central importance of the defendants' activities in determining the authenticity of works attributed to Calder, and the art market's reliance on the power and influence of these defendants in making such determinations, plaintiff has suffered antitrust and general tort injuries.

27. Plaintiff is entitled to compensation for the damages caused by these defendants' abuse of their monopoly power, including treble damages, attorney's fees and court costs.

## I.  THE PARTIES

28.  Plaintiff Joel Thome ("Thome") is a musician, composer and orchestral conductor. He is the sole owner of the Stage Set, and resides in New York, New York.

29.  Defendant the Alexander & Louisa Calder Foundation a/k/a the Calder Foundation ("the Foundation") is, on information and belief, a New York not-for-profit corporation with a place of business at 207 West 25th Street, 12th Floor, New York, New York 10001.

30.  The Foundation was created in 1987, and is a tax-exempt private foundation under § 501(c)(3) of the Internal Revenue Code.

31.  Defendant Alexander S. C. Rower a/k/a Sandy Rower is, on information and belief, the Chairman and President of the Foundation's Board of Trustees, and a grandson of Alexander Calder.

32.  Defendants Andréa Davidson, Sandra Calder Davidson and Shawn Davidson are, on information and belief, members of the Board of Trustees of defendant Foundation, and are also descendants of Alexander Calder by blood or marriage.

33.  In particular, Andréa Davidson is Calder's granddaughter, and Shawn Davidson and Holton Rower are Calder's grandsons.

34.  Defendant Gryphon Rower-Upjohn is the Vice-President of the Foundation's Board of Trustees, and is Alexander Calder's great-grandson.

35.  On information and belief, defendants Sandra Calder Davidson and Shawn Davidson are co-executors of the estate of Alexander Calder, pursuant to his will.

-6-

36. According to the Foundation's website, Peter Lipman is a research geologist and past president of the San Jose Museum of Art, and Seán Sweeney is a linguist, farmer, trustee and executor of the Estate of James Johnson Sweeney, and trustee of the Estate of James Joyce.

37. Defendants John Does 1-5 are persons who have engaged in the conspiracy set forth and described herein, but whose identities are presently unknown to plaintiff.

38. On information and belief, all of the individual defendants are citizens of the State of New York.

39. One of the Foundation's functions is to issue inventory number for Calder artworks registered with it. The art market considers an inventory number to be equivalent to a certificate of authenticity. Conversely, the art market considers the Foundation's refusal or failure to issue an inventory number as tantamount to a determination that the work is not authentic, and renders the work essentially unmarketable.

40. The Foundation's wealth has risen meteorically in recent years. According to its public tax returns (Form 990-PF) the value of its assets in 2004 was slightly more than $8 million. In 2006, it was $22 million. In 2009, it was around $135 million. In 2010, it was in excess of $151 million. But its most recent return, for 2011, lists the fair market value of its assets at more than $353 million. Thus, its wealth has apparently more than doubled in one year, and has risen more than tenfold in less than five years.

41. This increase in wealth is a direct result of the defendants' monopolistic control of the market for Calder artworks, and its success in driving up the prices for such works. In

effect, the Foundation and its Board have been able to manipulate the market so as to increase their personal wealth and power, to the detriment of their victims, including plaintiff..

## II.  SUBJECT MATTER JURISDICTION AND VENUE

42.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1337(a), because plaintiff's claims arise under §§ 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2), and are brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

43.  This Court also has subject matter jurisdiction because plaintiff's Lanham Act claim arises under 15 U.S.C. § 1125(a).

44.  This Court has subject matter jurisdiction of the state law claims pursuant to the principles of pendent jurisdiction.

45.  Venue lies in this District pursuant to 28 U.S.C. §1391(a) and (b), in that all of the defendants may be found in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.  HISTORY OF THE STAGE SET

46.  Around 1935, a Hartford, Connecticut music group, The Friends and Enemies of Modern Music, whose music director was American composer Virgil Thomson, commissioned Alexander Calder to create a mobile set for a production of a musical work called *Socrate*, by French composer Erik Satie.

47.  In February 1936, the production was presented at the Hartford Music Festival, at the Wadsworth Atheneum.

48.  After one performance, the set was shipped to Colorado Springs, and two more performances of *Socrate* were presented there. Thereafter, unfortunately, the set was scrapped.

49.  Around 1958, Thomson described the performance as follows:

Calder's set for Erik Satie's *Socrate*, three dialogues out of Plato set to music for voice and orchestra, is so plain to look at and yet so delicately complex in its movements (for it does move and without injury to musical effect), so intensely in accord with the meaning of the musical work and yet so rigidly aloof from any over-obvious illustrating of it, that it remains in my memory as one of our century's major achievements in stage investiture.
*See* https://tinyurl.com/msx5lcs (accessed December 3, 2013).

50.  Some forty years later, in May 1975, Thomson, who was a friend and colleague of plaintiff's, was reminiscing with him about the 1936 production, and they discussed the possibility of re-creating the set and mounting a new theatrical production of *Socrate*, to commemorate the fortieth anniversary of the original.

51.  Thomson was enthusiastic about the possibility, and wrote a letter to Calder, asking if he would like to reconstruct the set.  Calder replied, "it would be fun to revive that bit."  See Exhibit B.

52.  Calder returned to New York in October 1975 for his annual exhibit at the Perls Gallery.

53.  Around that time, plaintiff, Calder, Thomson, and the staff of the Whitney Museum (which was preparing a Calder retrospective called Calder's Universe) all met.  They discussed the production in detail.  One Whitney staff member even managed to locate a copy of Calder's original 1936 sketch.

54. At the meeting, Calder took plaintiff aside and said how delighted he was, and that this was the work that he most wanted to do at that time of his life.

55. At the conclusion of the meeting, Calder agreed to proceed to reconstruct the set.

56. He also asked plaintiff to commission another version, one-third smaller than the original, to fit smaller prosceniums, thus insuring the widest possible audience for the production.

57. Klaus Perls, Calder's long-time art dealer, appointed his skilled Calder restorer, Walter Hatke, to produce the sets under Calder's supervision.

58. Hatke thereafter fabricated the smaller version, along with a maquette.

59. An architect, John Clauser, was commissioned to produce working plans, which Perls took to France in the summer of 1975, to obtain Calder's approval.

60. Calder signed the plans and authorized production to proceed. See Exhibit C.

61. The set was fabricated and completed later that summer, and a performance was scheduled for November 1976 at the Beacon Theater in New York City.

62. When in New York that fall for his exhibit at the Perls Gallery, and the opening of the Whitney retrospective, Calder again told plaintiff how delighted he was with the project.

63. He asked about the lighting design. He said "keep the blue on the cyclorama," and told the lighting designer to "use your imagination" for the rest of the stage lighting.

64. They then agreed to meet at the theater to see the completed set installed.

65. On November 11, 1976, as plaintiff was about to confirm the appointment, he learned that Calder had died suddenly. The performance was immediately canceled.

-10-

66. Plaintiff and Calder's family (some of whom are Trustees of the Foundation to this day) then resolved to put on the performance later, as a tribute to Calder.

67. They did so in 1977, around the first anniversary of Calder's death, to considerable critical and public acclaim. The performance was at the Beacon Theater in New York City. Exhibit D contains copies of some of the publicity and reviews which appeared at the time. There are also photographs of members of Calder's family at the event.

68. Plaintiff was the musical director and conductor of the performance. Some excerpts can be viewed at www.youtube.com/watch?v=yeMT68Rq8cs. There is also a website containing information about the Stage Set and the performance, at www.caldersocrate.com.

69. After the performance, plaintiff retained the Stage Set, and has at all times been the rightful owner, having paid personally all expenses incurred for its original production, fabrication and storage since then.

70. The two sets and the maquette are in a warehouse in Kingston, New York, and are in pristine condition. The documentary archives are in plaintiff's possession in New York City.

## IV. THE STAGE SET IS UNQUESTIONABLY AN AUTHENTIC CALDER.

71. Under all of the facts and circumstances, it cannot be reasonably disputed that the Stage Set is an authentic and genuine work of art by Alexander Calder.

72. Beyond the conclusive fact that plaintiff himself was personally involved in its creation, and worked directly with Calder, the documentation of its authenticity is extensive. Copies of some of the supporting materials are annexed as Exhibit E.

73. That documentation includes the following (Exhibits B, C, D and E).

a.  The statement by Calder to Thomson that he wants to re-create the Stage Set, based upon its 1936 original: "it would be fun to re-create that bit."

b.  Calder's handwritten statement on the plans, which reads, "Dear Joel, I have looked at the drawings and find them OK, and think everything OK, & construction can begin when you are ready./When I'll be in Phila. on <u>Oct. 4</u> & see you then & see a rehearsal." (emphasis in original).

c.  Calder's personal involvement in the preparation for the 1976 performance.

d.  The program for the 1976 performance, which says "Moving Sets by Alexander Calder for Erik Satie's 'Socrate' 1936/1976."

e.  The program for the 1977 "National Tribute to Alexander Calder" names a Calder Memorial Committee.  On the list of names is Mr. & Mrs. Klaus G. Perls (Perls was Calder's life-long dealer) and Mary Calder Rower, who was Calder's daughter and, until her death in 2011, a Trustee of the defendant Foundation).[2]

f.  A list of names provided to the Committee by Louisa Calder (Alexander's widow), which includes Shawn Davidson and Mary Calder Rower, the former of whom is a defendant in this action.

g.  A letter from Louisa Calder to plaintiff, dated July 27, 1997, offering her assistance with the memorial, and enclosing a check to defray some expenses.

h.  Photographs of Louisa Calder and Mary Calder Rower at the performance.

---

[2]  She was also until her death a plaintiff in an action against the Klaus Perls estate in the Supreme Court, New York County, entitled *Sandra Calder Davidson et al. v Katherine Perls et al.*, Index No. 651760/2010.  The action, which concerned the authenticity and ownership of certain Calder artworks, was dismissed on December 24, 2013.

i.  Reviews of the performance in major media outlets, all of which lauded the set in glowing terms.

74.  Subsequent events also prove authenticity.  In 1996, the version of the stage set which is 2/3 the size of the original one was displayed at the New York Public Library for the Performing Arts, at Lincoln Center,  as part of an exhibition entitled "Puppets Performing Objects in the 20th Century."

75.  In 2004 and 2005, a film of the memorial performance was part of an exhibition of works by Calder and the Spanish artist Joan Miró, at the Phillips Collection in Washington, D.C.

76.  In the face of this undisputed documentary evidence, and the personal involvement of Calder's own family, it cannot be asserted in good faith that the Stage Set is not authentic.

77.  The continued refusal by defendants to authenticate the Stage Set, in the face of this overwhelming evidence (including the personal involvement of some of the individual defendants in the memorial performance), is blatant bad faith.

78.  Plaintiff is informed and believes that one or more of the defendants want to obtain the Stage Set for themselves, for a fraction of its value in the marketplace.

79.  In any event, regardless of the self-interest of the defendants, their continued refusal to authenticate the Stage Set dishonors the memory of Alexander Calder, his much-beloved body of work, and his place in the pantheon of truly great artists of the twentieth century.

## V.  PLAINTIFF'S DEALINGS WITH THE CALDER FOUNDATION

80.  In 1997, plaintiff suffered a debilitating stroke, which has permanently deprived him of the use of his left arm, ending his career as an orchestral conductor.

81. Being in need of funds, plaintiff approached the defendant Calder Foundation, which had been formed around 1987, and sought their assistance in authenticating the Stage Set, so that he could sell it.

82. Given the personal involvement of Calder in the re-creation and fabrication of the Stage Set, and of his family and associates in the 1977 memorial performance, plaintiff assumed that its authenticity would not be questioned, and that obtaining the *catalogue raisonné* numbers would be a mere formality.

83. In the summer of 1997, plaintiff submitted documentation for the Stage Set to the defendant Foundation, to support its inclusion in the *catalogue raisonné*.

84. In September 1997, defendant Foundation wrote to plaintiff, acknowledging receipt of the documentation, confirming that they had everything necessary, and promising to review the materials.

85. In a November 1997 telephone conversation between plaintiff and defendant Alexander S.C. Rower, the latter stated that the Stage Set would be included in the *catalogue raisonné*, and the two of them agreed upon the descriptive wording that would be used.

86. They agreed that the original 1976 large version would be described as a "re-creation" and that the smaller version, which was two-thirds the size of the original, would be a "new creation."

87. Plaintiff then submitted additional materials in early 1998 to demonstrate the authenticity of the Stage Set, receipt of which defendant Foundation acknowledged.

88.  Thereafter, notwithstanding the November 1997 telephone conversation, defendants failed to include the Stage Set in the *catalogue raisonné*, and have refused plaintiff's repeated requests to do so, to the present day.

89.  Defendants have never provided any explanation whatsoever for this failure and refusal; there has only been silence.

90.  Plaintiff has been offered substantial sums for the Stage Set by dealers, collectors and museums.

91.  Specifically, in March 2004, plaintiff received an offer from Jean Zimmerman, a dealer in New York City, on behalf of a client, to purchase the large set portion of the Stage Set for $200,000.

92.  Plaintiff and Zimmerman entered into a binding contract, but plaintiff lost the deal, solely because he could not provide *catalogue raisonné* numbers.

93.  In early 2005, plaintiff received a written offer from a Lincoln Stoller to purchase the Stage Set for $500,000.

94.  On information and belief, Stoller approached the defendants Foundation and Sandy Rower himself to try to induce them to issue *catalogue raisonné* numbers.

95.  Plaintiff was unable to consummate either the transaction with Zimmerman's client or with Stoller, as a direct consequence of defendants' refusal to issue *catalogue raisonné* numbers.

96.  Plaintiff is in ill health and in need of funds, and on information and belief defendants' intention is to pressure plaintiff into selling the Stage Set to them for a fraction of its true value.

## VI.  THE STATE COURT LITIGATION

97.  In 2007, plaintiff commenced an action in the New York County Supreme Court against defendants Calder Foundation and others.  The case is *Thome v. The Alexander & Louisa Calder Foundation et al.*, Index No. 600823/07 ("the State Court Action.").

98.  In the State Court Action, plaintiff sought a declaratory judgment that the work was an authentic Calder, damages for these defendants' interference with his contract rights, and for other relief.

99.  The Supreme Court dismissed the case on April 29, 2008.  Plaintiff then appealed the dismissal to the Appellate Division, First Department, which denied the appeal in December 2009.  The decision is reported at 70 AD3d 88, 890 NYS2d 16 (1st Dept.2009).

100.  Essentially, the Appellate Division said that the Foundation had no legal obligation to render an opinion as to the authenticity of the Stage Set, that the Court would not declare that the Stage Set was authentic, and that the remaining claims were time-barred.

101.  Plaintiff sought leave to appeal the dismissal to the New York Court of Appeals, which denied leave, 15 NY3d 703, 933 NE2d 216, 906 NYS2d 817 (2010).

102.  The present action is based upon facts and events and case law developments which have occurred and arisen after the dismissal of the State Court Action.

103.  The claims and facts in the present action were neither raised nor litigated in the prior action.

104.  In this action, plaintiff does not seek a judgment determining that the Stage Set is authentic, but solely money damages and other related relief, pursuant to the U.S. antitrust laws, and the statutory and common law of the State of New York.

## VII.  PLAINTIFF'S RECENT ATTEMPTS TO ENTER THE MARKETPLACE

105.  In 2012, plaintiff asked a Manhattan art gallery to assist him in selling the Stage Set.

106.  At various times in 2012 and 2013, the gallery approached major museums to elicit interest.  Among them were the Hirschhorn in Washington, D.C., the Centre Pompidou in Paris, the Getty in Los Angeles, the McNay in San Antonio, and the Whitney in New York City.

107.  All of these museums immediately expressed great interest in the Stage Set, and the gallery began discussions and negotiations with them.

108.  On information and belief, representatives of these museums approached the defendant Foundation, and one or more of the individual defendants, and sought their opinions as to the authenticity of the Stage Set.

109.  Without exception, all of the museums thereafter either said that they would not be interested in purchasing the Stage Set, or refused to respond to the gallery at all.

110.  All of them refused to inform the gallery or plaintiff of the reasons for their sudden lack of interest.

111.  On information and belief, the gallery was advised by several dealers not to become involved with the Stage Set, because of the defendants' power in the Calder marketplace.

112.  In February 2013, the gallery approached Sotheby's auction house about offering the Stage Set at auction.

113. Although Sotheby's expressed great interest initially, they then said that they would not become involved, because they had to continue to work with the defendants in the Calder marketplace.

114. In February or March 2013, the gallery contacted the Director of the Hirschhorn Museum, Richard Koshelak, who was very enthusiastic about the Stage Set.

115. Shortly thereafter, he went silent and would not respond to further inquiries.

116. In April and May 2013, the gallery approached the director of the Eli Broad Museum at Michigan State University.

117. He too was initially interested, but then stopped responding to further inquiries.

118. The gallery repeatedly sought to learn the reasons for the defendant Foundation's refusal to authenticate the Stage Set, but was unable to do so.

119. In October and November 2013, plaintiff's counsel approached four different art lenders, seeking a loan for living expenses.

120. Plaintiff sought approximately $150,000, to be secured by a lien on the Stage Set. This was only a small fraction of its estimated $2 million value.

121. All four potential lenders were initially interested in pursuing the transaction, but all eventually would not proceed, because of the lack of inclusion of the Stage Set in the *catalogue raisonné*, which fact was disclosed to them.

122. All of the potential lenders readily acknowledged the authenticity of the Stage Set as a factual matter, as proven by the documents which plaintiff provided them.

123.    However, all of them told plaintiff that, given the lack of the defendant Foundation's authentication, the Stage Set would be unsaleable if they had to foreclose on it as collateral for the loan.

124.    Based upon the foregoing, the Stage Set is valueless and unsaleable.

125.    It is valueless and unsaleable solely because of the actions of the defendants, and their ongoing conspiracy to destroy the value of plaintiff's property, and to exclude him entirely from the market for Calder artworks.

126.    This conspiracy continues to the present day, with three more examples of plaintiff's exclusion from the market, just this year.

127.    Between September 2013 and January 2014, a contemporary art museum in Düsseldorf, Germany, the Kunstsammlung Nordrhein-Westfalen, mounted a large solo exhibition of Calder artworks from the 1930's and 1940's.

128.    Many of the works on display were the property of the defendant Calder Foundation, and defendant Rower wrote an essay which appears in the exhibition catalog.

129.    The catalog mentions that Calder "was close friends with several modern composers" and names Virgil Thomson as one of them (see ¶ 45 at 8, *supra*).

130.    In March 2014, plaintiff's counsel approached the curator of the exhibition, Dr. Susanne Meyer-Büsser about the Stage Set, thinking that perhaps she could assist plaintiff in finding a European museum or collector to purchase it.

131.  She immediately expressed interest in it, saying that she would talk with her colleagues, and she suggested that one of the major European theater museums might well be interested in purchasing "this fascinating work by Calder."

132.  She has not responded further since then, despite a request for an update.

133.  Also this year, plaintiff's counsel has approached Sotheby's and Christie's auction houses, and sought to have them take the Stage Set on consignment, and either to auction it publicly, or to seek to arrange a private sale.

134.  Both Sotheby's and Christie's were initially interested, and were provided with documentary materials about the Stage Set.

135.  In February 2014, Sotheby's declined to accept the Stage Set, and did not provide any reason for doing so, despite a request for an explanation.

136.  In April 2014, Christie's returned the documentary materials without any comment whatsoever.

137.  On information and belief, each of these initially interested parties were discouraged from proceeding further because of the actions or statements of the defendants.

## VIII. DEFENDANTS' FLIP-FLOPS: AUTHENTIC AND THEN INAUTHENTIC

138.  Plaintiff has never received any response from the defendants explaining the reasons for their refusal to authenticate his Stage Set.

139.  However, despite their current refusals to authenticate it, the defendants have acknowledged its authenticity in the past.

140.  For example, as stated previously, in November 1997 plaintiff had telephone conversations with defendant Sandy Rower about authentication of the Stage Set.

141.  At that time, Rower agreed that the Stage Set was authentic, and he and plaintiff discussed only how it should be described in the *catalogue raisonné*, that is, whether it should be described as a re-creation of the original work from 1936, or as a new work.

142.  There was no suggestion at that time that the Stage Set might not be authentic.

143.  In 2002, plaintiff wrote to defendant Sandy Rower, asking him about possible options for a sale.  A copy of the letter is Exhibit F.

144.  Plaintiff received no response to this letter.

145.  In July 2007, an article about this controversy appeared in Art + Auction magazine. A copy of the article is Exhibit G.

146.  The article states in pertinent part:

Reached at the Foundation's offices in New York, Sandy Rower, its executive director and grandson of the late sculptor, said, "We'll authenticate it for the Orchestra of Our Time, but we won't for another party unless they can prove they're the rightful owner."

147.  Orchestra of Our Time is a non-profit tax-exempt 501(c)(3) organization, which plaintiff formed in the 1970's, to put on performances of contemporary music.  It still exists, but has been largely inactive since plaintiff's stroke.

148.  However, plaintiff, not the Orchestra, is the owner of the Stage Set.

149.  Defendant Rower's statement demonstrates the arbitrary and capricious, and anti-competitive and monopolizing, nature of the defendants' actions.

150.   The authenticity of a work of art does not depend upon who owns it, and any determination which does depend upon the identity of the owner is inherently suspicious.

151.   Rather, a good faith determination of authenticity of any work of art must be based solely on objective principles such as provenance, history, forensics and scholarship to the greatest extent possible, and solely with respect to the artwork itself, not who owns it.

152.   The defendants cannot in good faith claim that they can withhold a finding of authenticity solely because of an irrelevant dispute over ownership.

153.   The defendants have also altered the description of the Stage Set on their website. At some point in 2009, in an extensive list of Calder exhibitions posted on the defendant Foundation's website, the following appeared (Exhibit H):

> *A National Tribute to Alexander Calder* (1977).  Program included a production of Socrate by Eric [sic] Satie <u>with mobile set designed by Calder</u>; *Four Saints in Three Acts* by Gertrude Stein performed by Joel Thome and the Orchestra of Our Time. (emphasis added).

154.   At some point later that year, the entry was changed, as follows (Exhibit H):

> *A National Tribute to Alexander Calder* (1977).  Program included a production of Socrate by Eric [sic] Satie <u>with mobile sets recreated from Calder's designs</u>; *Four Saints in Three Acts* by Gertrude Stein performed by Joel Thome and the Orchestra of Our Time.  (emphasis added).

155.   At the present time, this is all that appears in the same list of exhibitions about the performance (see http://calder.org/life/exhibitions, accessed December 3, 2013):

> Beacon Theater, New York. *A National Tribute to Alexander Calder.* 10–11 November 1977. *Memorial / Tribute, Theatrical Performance.*

156.  Thus, in 2009, according to defendants, the Stage Set was "designed by Calder," and then it was "recreated from Calder's designs."

157.  Both of these statements are acknowledgments of authenticity, although the latter is far less authoritative than the former.

158.  However, since 2009, according to the Foundation's website, the Stage Set has apparently disappeared altogether, and plaintiff had nothing whatever to do with the memorial performance.

159.  The arbitrary, capricious and shifting nature of defendants' statements regarding authenticity is pure revisionist history, and strong evidence of conduct by a monopolist, intent upon preventing plaintiff from participating in the marketplace.

## IX.  THE STORY OF *MOUNTAINS AND CLOUDS*

160.  In contrast to their conduct toward the plaintiff, the defendants are willing to authenticate even a posthumous Calder artwork when it suits their purposes, and if the owner is sufficiently prestigious.

161.  Around the same time as Calder was working with plaintiff on the Stage Set in 1976, he had received a commission from the U.S. Senate, for a monumental sculpture to be placed in the atrium of the Hart Senate Office Building, in Washington, D.C., which was then under construction.

162.  On November 10, 1976, Calder personally brought a maquette for the sculpture to Washington, and it was accepted with Calder's approval.

163.  That night, on his way back to New York, Calder suffered a fatal heart attack.

164.  In the years that followed, there was difficulty in obtaining public funds for the project, but funds were finally obtained in 1982.  The sculpture was fabricated and then installed in the atrium in 1986, where it remains to this day.  It is called *Mountains and Clouds*.

165.  The story of *Mountains and Clouds* is described in detail on the U.S. Senate's website, at https://www.senate.gov/artandhistory/art/artifact/Sculpture_25_00007.htm.  See also its Wikipedia entry, at https://en.wikipedia.org/wiki/Mountains_and_Clouds (both accessed December 6, 2013).

166.  Although it was not completed and installed until a decade after Calder's death, and thus never signed nor authenticated by him, the sculpture is listed in the defendant Foundation's *catalogue raisonné*, and there is no dispute by anyone that it is an authentic work by Calder.

167.  According to the Foundation's website, the work is listed as belonging to the Foundation's collection of over 600 items, and installed at the Hart Senate Office Building. *See* http://www.calder.org/news/on-view-now (accessed December 12, 2013).  It shows the dates of construction as 1976-87.

168.  Thus, the defendants are willing to authenticate Calder artworks created even after his death, so long as the owner or lessee has sufficient prestige.

169.  The contrast between the defendants' treatment of *Mountains and Clouds* and of plaintiff's Stage Set, demonstrates vividly the arbitrary and capricious nature of defendant's authentication processes and the bad faith of their dealings with the plaintiff.

## X.  OTHER VICTIMS OF DEFENDANTS' CONSPIRACY

170.  On information and belief, these defendants also have manipulated the market for Calder artworks by withholding authentication of other works which are unquestionably authentic, with the intention of preventing the owners of these works from selling them.

171.  For example, on information and belief, a collector named Robert Lawrence, a film producer in California, owns an oil painting by Calder.

172.  On information and belief, Mr. Lawrence has been unable to put his painting up for auction, solely because the defendant Foundation refused to authenticate it.

173.  Another example is a famous Calder sculpture, "The Universe," located in the lobby of the former Sears Tower in Chicago, Illinois.

174.  According to news stories, Sears, which used to be in the tower but has relocated, had commissioned the sculpture, but wants to buy it back from its present owners, pursuant to an option agreement with them. See www.artdaily.com/news/41510/Sears-Wants-to-Buy-Back-Willis-Tower-Sculpture-Made-by-Alexander-Calder (accessed December 6, 2013).

175.  However, on information and belief, the defendant Foundation has acted to prevent the sale from taking place, by arbitrarily–even ludicrously--withholding acknowledgment of the sculpture's authenticity, by claiming that it is site-specific, although it is readily removable.

176.  The authenticity of this world-famous sculpture, which has been in the building since 1974, cannot reasonably be questioned.

177.  Most recently, in February 2014, one Patrick Cramer, a Swiss art dealer, brought an antitrust suit against the Calder Foundation and the individual defendants in this Court,

alleging that the Foundation has refused to authenticate a sculpture which Mr. Cramer's father had purchased directly from Calder himself in 1948.

178.  The suit alleges that the Foundation has prevented the sale of the artwork by falsely claiming that the sculpture is a fragment of a larger work, but that no one ever claimed that to be so until the plaintiff sought to sell it.  The case is *Cramer v. The Calder Foundation et al.*, 14 Civ. 1375 (RMB).

<h2 style="text-align:center">XI.  ANTITRUST ALLEGATIONS</h2>

## 1.  The Relevant Market

179.   These defendants, and other co-conspirators whose identities are presently unknown to plaintiff, have conspired among themselves to monopolize, unlawfully dominate and unreasonably restrain the relevant market.

180.   The relevant market may be defined as the offering and sale, at auction or otherwise, of works of art created by Alexander Calder, worldwide.

181.   The market for Calders is a submarket of the global market for modern and contemporary art, which includes hundreds of twentieth and twenty-first century artists, including Pollock, Picasso, Matisse, Warhol, Rothko and many others, some famous, some not.

182.  Each of these individual artists comprises his or her own distinct submarket, within the general global market for modern and contemporary art.

183.  The limitation of the relevant submarket specifically to Calder artworks is based upon these facts, among others:

a.  Calder artworks are typically included in the category of "modern and contemporary artists" in auctions, museum showings, dealer and gallery advertising, sales literature, and newspaper and magazine articles;

b.  Calders are advertised for sale, whether privately or at auction, by specific reference to the name Alexander Calder, rather than by generic reference to "modern and contemporary art."  In effect, "Calder" is a famous brand name, and has many of the characteristics of a strong trademark, in that it functions as a unique identifier, and guarantees a level of artistic and esthetic quality which the market recognizes, and is willing to pay for.

c.  There have been for years many solo showings and exhibitions which feature works by Calder exclusively, without the presence of works by other modern and contemporary artists.

d.  The market recognizes persons possessing expertise about specific artists, not just with respect to modern and contemporary artists generally.  Thus, an expert in Calder's works may not know very much about other artists in the category, such as Rothko or Pollock.  Conversely, an expert in modern and contemporary art generally may lack expertise in the specific category of Calders.

e.  Living artists are conscious of, and often influenced by, the styles represented by specific artists, as opposed to the styles of modern and contemporary artists generally.

f.  Prospective buyers and sellers estimate the value of Calders  primarily by reference to and comparison with other Calders, as opposed to the hundreds of other artists included in the general category of modern and contemporary art.

g. Calders are not interchangeable with works by other modern and contemporary artists, or even with other Calders. Rather, every work by Calder is considered to be unique and irreplaceable, based upon its history, stylistic characteristics, provenance, quality, and the subjective tastes of the participants in the submarket.

184. In other words, works of art are not fungible, but are highly specific, individual and unique.

185. Original works of a particular artist are thus a cognizable market for the purposes of the antitrust laws, and there is case law precedent for such a conclusion.

186. Thus, because major art purchases are expensive--sometimes in the millions of dollars–and because purchasing decisions are motivated by these factors and by subjective tastes, and because works of art are unique, there is little or no cross-elasticity of demand.

187. Moreover, the supply of artwork by a deceased artist is obviously fixed, and by definition cannot be increased by anyone, such as a potential competitor who would seek to enter the marketplace.

188. Moreover, it is possible to effectively limit that supply even further, by having the market power to be able to dictate whether a given work is by Calder or not.

189. Defendants, and other similar foundations and authentication boards, have frequently attempted to do exactly that with respect to Calder and other artists, and to do so arbitrarily, regardless of whether a work is actually authentic or not.

190. The market for modern and contemporary art is in general a relatively open one, at least to anyone possessed of sufficient funds to enter it.

191.  For example, with respect to auctions, prospective buyers are together at one time for the auction, and bidders can be numerous, even participating without being physically present in the auction room.

192.  Auctions are held in various cities around the world, including New York and London, and prospective bidders from many countries are often in attendance, either personally or by proxy, to bid on a specific work of art.

193.  There is also a substantial market of private sales between owners, dealers and purchasers.

194.  An essential part of both the public auction market and the market in private sales is the process of authentication, which is a distinct market by itself.

195.  Because the names of renowned artists are in essence strong trademarks, it is essential to the proper functioning of the markets that works described as being by any particular artist are in fact created by that artist, *i.e.*, that a given work is authentic, and is what it purports to be, and created by the artist to whom it is attributed.

196.  Although the art market for artwork is distinct from the authentication market, the two are nonetheless closely and inextricably linked.

197.  This is because those who bid for and buy modern and contemporary art, whether privately or at auctions, are typically not possessed of the expertise and knowledge needed to determine for themselves the authenticity of a work they wish to buy.

198.  Alternatively, even if they possess a high level of expertise in the field, they may understandably not wish to take that risk upon themselves.

199.  Bidders and buyers thus rely heavily upon the opinion of one or more experts to guide their decisions, and to insure that a given work is what it is represented to be.

200.  Museums, galleries and auction houses routinely arrange for inspections and opinions from art experts before offering a work of art for sale, and will not offer a work for sale unless and until they are satisfied of its authenticity.  To do otherwise would be to risk liability and damage to reputation.

201.  This is particularly so if the work is newly discovered and not previously recognized as a work by the artist whose name or style is connected to it, by signature or otherwise, or if its provenance (*i.e.*, the record of ownership from its creation by the artist to the present day) is unclear or not well-documented.

202.  Thus, because of the central importance of authenticity, large sums of money can be paid for works of art when an acknowledged expert renders a convincing opinion of authenticity or probable authenticity.

203.  Conversely, without such an opinion, a given work of art is unmarketable and worthless, or at the least, worth far less than it would otherwise be with such an opinion attached to it.

204.  Thus, buyers of artworks are buying not just the opinion and the reasoning behind it, but the credentials and expertise of the authenticating expert as well.

205.  The existence of such experts, acting in good faith and possessed of the necessary skill, expertise and knowledge, is essential to the proper functioning of the art market.

206.   Without such experts, willing and able to render reasoned opinions on the authenticity of major works of art, the art market is denied essential information that the public needs in order to determine whether to buy, and how much to pay for, a given work of art.

207.  In effect, those whom the art market recognizes as having the skills and credentials to authenticate works of art are "essential facilities" within the meaning of the antitrust laws.

208.  As such, the marketplace reality is that there is no feasible alternative route for persons who desire to buy or sell a work of art whose authentication is required.

209.  In other words, market participants must obtain a favorable opinion from such persons before a transaction can be consummated, and refusal to issue one is an absolute bar.

210.  It is widely recognized that persons with such expertise should not have any financial interest in the outcomes of their evaluations, so as to avoid the existence or appearance of a conflict of interest.

211.   Notwithstanding that recognition, the defendants here have substantial such conflicts of interest.

212.  According to a 2012 interview with defendant Alexander S.C. Rower, the market for Calder artworks is very strong, and increasingly so:[3]

> Seven of the artist's top 10 auction results have come in the past five years, according to the Artnet database, and an artist record was set in 2010, when the 16-foot-tall Red curlicue (1973) sold for $6.4 million at Christie's New York. (It was also probably not an accident that, when Vogue magazine visited Gagosian, the world's most powerful gallery, to photograph a group of its female employees for an article, a gigantic Calder mobile could be seen above them.)

---

[3]       http://galleristny.com/2012/01/going-mobile-what-is-next-for-the-heirs-of-sculptor-alexander-calder (accessed December 4, 2013).

"The weight of acceleration behind Calder is faster than any other artist," said Mr. Glimcher, who has worked with Mr. Rower for decades. (In November, the gallery mounted the exhibition "Calder 1941," which included works from the foundation.) In his view, the artist is still undervalued, the easy popularity of his work still overshadowing his achievements. Until 1999, no Calder had ever sold at auction for more than $2 million, and even large outdoor works only rarely made more than $1 million. In recent years works are known to have sold privately for more than $15 million.

213.  The foregoing facts demonstrate a specific intent to monopolize the relevant market, namely the secondary market for works of art by Alexander Calder.

214.  The foregoing facts demonstrate that defendants have fully achieved their intention and goals of achieving monopoly power in that market.

215.  They can manipulate the prices at which Calder artworks can be bought and sold.

216.  They even have the power to prevent any purchases or sales in their sole discretion, simply by denying authenticity of any work which they may prefer not be purchased or sold, regardless of the reason.

217.  On information and belief, the defendants have acted so as to prevent purchases or sales of which they do not approve, simply by withholding a finding of authenticity, or threatening to do so.

218.  In other words, merely having the funds to purchase a Calder artwork is no guarantee that one will be able to buy it in the market place for a fair price.

219.  Conversely, merely being the owner of a Calder artwork is no guarantee that one will be able to sell it in the market place for a fair price.

220.  As the rapidly escalating wealth of the Foundation demonstrates, the conspiracy between the defendants has been highly successful.

221.  They have manipulated and obtained total control over the relevant market by way of actions which violate the antitrust laws and damage competition.

2.  Trade and Commerce

222.  Defendants' acts, as alleged herein, have resulted in the restraint of interstate commerce in New York City, the United States generally, and elsewhere where works of art are bought and sold, and have tended to create, and have actually created, a monopoly within such geographic areas.

223.  Plaintiff has been injured in his business and property by reason of the performance of those acts in violation of the antitrust laws, in that plaintiff owns valuable property which he cannot sell or pledge, solely and directly because of the actions of the defendants.

224.  Defendants' actions have rendered plaintiff's property valueless and unsaleable.

225.  Beginning in or about 1987, and continuing up to present time, the defendants have restrained trade, monopolized and attempted to monopolize said trade and commerce in the offering and sale of works by Calder, in New York, the United States generally, and the rest of the world, in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

226.  These violations are continuing and will continue unless and until the relief requested herein is granted.

227.  Pursuant to, and in furtherance of, the aforementioned restraint of trade, actual and attempted monopolization, and conspiracy to monopolize, defendants have sought to prevent various Calders from being offered and sold, at auction or otherwise, by, among other things:

a.   Supposedly investigating putative Calders brought to their attention for their authenticity, when in reality the defendants have already determined to deny authenticity;

b. Requiring the issuance of a favorable opinion of authenticity from themselves, before allowing a work to be bought or sold as a genuine Calder;

c. Employing different standards for the authentication of works owned by defendants personally and/or their co-conspirators personally, from those of plaintiff and others similarly situated.

d. Arbitrarily granting or withholding authentication depending upon the identity of the owner or purchaser;

e. Arbitrarily reversing a prior determination that a given work is authentic, and declaring it not authentic, and vice versa.

3.  Anti-Competitive Effects

228.  The foregoing combination of conspiracy and violations have had clear and substantial effects upon the market for artworks by Calder.

229.  In addition to successfully inducing artificial scarcity in the relevant market, the defendants' actions have had the following effects, among others:

a. Competition for the purchase and sale of Calder artworks has been substantially lessened.

b. Competition for the authentication of Calder artworks by other experts has been eliminated.

c. Owners of authentic Calder artworks are reluctant to submit them to the defendants, for fear of an arbitrary denial, and the consequent destruction of the value of their property.

d.  Reducing the supply of authentic Calder artworks at any given time.

e.  Prices of Calder artworks have been maintained at arbitrary, excessive, and noncompetitive levels for works authenticated by defendants.

f.  Conversely, prices of Calder artworks not authenticated by defendants have had their prices diminished to the point of becoming worthless.

g.  Plaintiff and other investors, museums, art owners and  purchasers all have been denied the benefits of a competitive market for Calder artworks.

h.  Millions of dollars in interstate transactions and commerce relating to the buying and selling of Calder artworks have been restrained by defendants' monopolistic conduct.

230.  In effect, defendants function as a private standard-setting association.

231.  As such, they have economic incentives to restrain competition, and the process of authentication which they engage in has the potential for anti-competitive harm, and has actually caused anti-competitive harm.

232.  Because of the arbitrary, capricious and secretive nature of the defendants' authentication process, and the defendants' individual economic interests, the anti-competitive harm which they cause far outweighs the potential benefits to the market.

233.  Moreover, defendants actively enforce their decisions regarding authenticity, by favoring participants who they wish to be involved in the Calder market place, and disfavoring ones such as plaintiff.

234.  Defendants are not exempt from their obligation to comply with the antitrust laws merely by virtue of being engaged in not-for-profit activities.

235.  In any event, the individual defendants are engaged in commerce for profit.

## XII.  PLAINTIFF HAS SUFFERED AN ANTITRUST INJURY, AND HAS ANTITRUST STANDING.

### 1.  Antitrust Injury and Antitrust Standing

236.  Plaintiff has suffered an antitrust injury and has antitrust standing.

237.  Plaintiff's injury is one which the antitrust laws were intended to prevent, and which has arisen directly from defendants' unlawful acts as set forth above.

238.  As a direct result of defendants' actions, plaintiff has been denied the right to enter and participate in the market for sales of Calder artworks on a competitive basis.

239.  Solely because of defendants' monopoly power over that market, plaintiff has been denied the right to realize the value of his unique and culturally significant property.

240.  But for that monopoly power, plaintiff would have been able to realize a substantial sum from the sale of the Stage Set in the open market.

241.  The Stage Set is highly valuable and readily saleable, as is proven by the offers which plaintiff has received.

242.  Plaintiff has lost significant deals, based upon firm written offers, solely because he could not obtain authentication from the defendants.

243.  Thus, plaintiff's antitrust injury is not speculative, but is genuine and ongoing.

244.  Defendants' willful refusal to provide authentication has caused plaintiff an antitrust injury.

245.  Defendant's monopoly position has the effect of stifling free and open competition in the market for Calder artworks, to the detriment of that portion of the public which wishes to buy and sell those works freely.

246.  Defendant's monopoly position is anti-competitive, and has deprived plaintiff of his right to compete, and to advance the public interest in free and unfettered competition in the marketplace for Calder artworks.

247.  Defendants' actions are willful and malicious, as is demonstrated by their initially expressing directly to plaintiff, and to the press, their willingness to authenticate the Stage Set, and publicly acknowledging its authenticity on its website, and then later refusing to respond to plaintiff at all, and removing that acknowledgment from the website.

248.  Defendants' willfulness is further demonstrated by its statements to potential purchasers that they refuse to authenticate the Stage Set, and that they should not deal with the plaintiff.  In effect, he is the victim of a boycott.

249.  Defendants' willfulness is further demonstrated by the stark contradiction between their having authenticated *Mountains and Clouds*–which was not completed until ten years after Calder's death, and thus fabricated not at all by Calder, but only by others–and their refusal to authenticate the Stage Set, which was completed before then, by Calder himself.

250.  Such willfulness is alone sufficient to demonstrate that plaintiff has antitrust standing.

2.  Plaintiff is an "Efficient Enforcer."

251.  Plaintiff has suffered a direct and unquestionable injury, in that his property is unsaleable and valueless, solely because of the abuse of defendants' monopoly power.

252.  There exists an identifiable class of persons whose self-interest would motivate them to seek to vindicate the public interest in antitrust enforcement.

253.  That class of persons would include anyone in the position of plaintiff, who has been unable to sell a Calder artwork because of the defendant's monopoly power, and their refusal to authenticate a genuine Calder, or their threats to withhold authentication.

254.  The class would also include anyone who has paid an inflated price for a Calder artwork, because of the defendants' power and control over the marketplace, and its ability to maintain an artificial scarcity of Calder artworks by manipulation of the authentication process.

255.  A judgment for the relief sought in this action would necessarily be a ruling that defendants' monopoly power is unlawful, and that defendants have, for their personal benefit, abused their position to destroy competition in the market for Calder artworks.

256.  That class of persons is not so large that it would be difficult to identify damages and apportion them among the victims of the defendants' monopoly power.

257.  In other words, as a result of a judgment granting for relief in this action, any member of that class would have an individual claim for damages, and that claim would be substantial enough to justify their bringing an individual claim.

258. Plaintiff is an efficient enforcer of the antitrust laws which defendants have violated.

259.  The issues raised in this case affect competition generally in both the submarket for Calder artworks, and in the secondary market generally, with respect to artists for which there exist foundations similar in purpose and operation to the Calder Foundation, who may have similarly violated the antitrust laws.

3.  The Defendants' Conspiracy

260. Since 1987, defendants have been engaged in an ongoing conspiracy to monopolize, control and manipulate the market for Calder artworks.

261.  The conspiracy is between one or more of the individual defendants, and the defendant Foundation itself, which they are charged with the fiduciary obligation to manage and operate in the public interest.

262.  There appears to be no formal method for determining whether a putative Calder is authentic or not.

263.  Defendants do not explain their decision to grant or withhold authentication, and operate in total secrecy.

264.  Defendants claim that they refuse to set out their criteria so as to discourage forgeries.

265.  The claim is false and disingenuous.

266. On information and belief, the defendants have arbitrarily denied the authenticity of works which were previously owned by either the estate of Calder, or by one or more of the individual defendants themselves.

267.   On information and belief, defendants have worked together to deny the authenticity of genuine Calder artworks as a form of retaliation against disfavored owners.

268.   On information and belief, defendants have threatened to deny the authenticity of genuine Calder artworks, so as to force owners to sell their works to one or more of the defendants at a reduced price.

269.   On information and belief, defendants have acted arbitrarily, and without regard to recognized scholarly principles of authentication, when doing so advances their financial interests.

270.   On information and belief, defendants have acted arbitrarily, and without regard to recognized scholarly principles of authentication, when doing so advances the financial interests of their favored customers and collectors.

271.   Defendants have used their monopoly control so as to create an artificial scarcity in the market for Calder artworks, thus driving up prices for potential purchasers.

272.   Defendants have used their monopoly control so as to artificially inflate the value of Calder artworks which they possess or own.

273.   On information and belief, the defendant trustees of the Foundation have never held any formal meetings, as required by law.

274.   Defendants decide in secret among themselves whether or not to authenticate a given work, depending in part on who owns it, who wants to buy it, and how it affects their own property interests in Calder artworks which they already own, or may wish to acquire.

275.  Several former trustees of the defendant Foundation have told plaintiff that they have no doubt about the authenticity of plaintiff's Stage Set, and that they disagree with the defendant Foundation's process of authentication generally, and its specific refusal in this case.

276.  The defendant Foundation is primarily run by defendant Alexander S.C. Rower and several other trustees and family members as their personal domain, with the other individual defendants generally acceding to their decisions, and largely ignoring their own personal fiduciary obligations to the Foundation.

277.  Defendants are thus engaged in a conspiracy to control the market for Calder artworks, and have succeeded completely in their goals.

278.  The conspiracy is in violation of the antitrust laws of the United States and of the State of New York.

## FIRST CLAIM
### (Monopolization; Sherman Act, Sections 1 and 2; Clayton Act)

279.  Plaintiff re-alleges paragraphs 1 through 278.

280.  The defendant Foundation and the individual defendants possess monopoly power in the relevant market, which is the secondary market for works of art by Alexander Calder.

281.  That monopoly power was willfully and unlawfully acquired, and is maintained by the defendants to the present time, a fact recognized by all of the participants in that market.

282.  That monopoly power is maintained by the *in terrorem* effect that any owner of a Calder artwork can suddenly find her property worthless, by the simple expedient of defendants' arbitrarily declaring that a Calder artwork is inauthentic.

283.  Defendants have conspired, and continue to conspire, in secrecy so as to boycott and prevent plaintiff from participating in the relevant market.

284.  Defendants have conspired, and continue to conspire, in secrecy so as to interfere with the  natural flow of interstate commerce, as participated in by plaintiff and by others.

285.  The defendants' concerted refusal to deal with plaintiff so as to permit him to sell his Stage Set in the marketplace has caused plaintiff substantial loss of profit, goodwill and reputation.

286.  Defendants' inexplicable conduct toward plaintiff has no legitimate business reasons, but rather is being done solely for the purpose of injuring plaintiff in his right to participate in the market for Calder artworks.

287.  Defendants' conspiracy amounts to a non-price horizontal restraint to shut out disfavored owners of Calder artworks (or disfavored potential purchasers), from participating in the marketplace.

288.  The above-described conduct is a combination or conspiracy in restraint of trade or commerce, and constitutes a *per se* violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. § 2.

289.  Alternatively, the above-described conduct is an unreasonable combination or conspiracy in restraint of trade under the rule of reason.

290.  The above-described conduct is also an actual monopoly of part of the trade and commerce in the relevant market.

291.  Alternatively, the above-described conduct is an attempt to monopolize part of the trade and commerce in the relevant market, with a likelihood of success.

292.  Plaintiff is entitled to damages in an amount to be determined by a jury and the Court.

293.  Pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, plaintiff is entitled to "recover threefold the damages by him sustained" for defendants' violation of 15 U.S.C. §§ 1 and 2, plus a reasonable attorney's fee.

## SECOND CLAIM
### (Lanham Act)

294.  Plaintiff re-alleges paragraphs 1 through 278.

295.   Defendants' acts in refusing to authenticate plaintiff's Stage Set, and in communicating that refusal to potential purchasers of it, constitute a false description of origin, and a false representation of fact about plaintiff's property.

296.  In truth, the Stage Set is an authentic work of art by Alexander Calder.

297.   Defendants are well aware that the Stage Set is an authentic work of art by Alexander Calder, because some of them participated in the 1977 memorial to Calder.

298.  Were there the slightest question as the authenticity of the Stage Set, the defendants who participated would surely not have lent their names and prestige to the memorial.

299.  It would be unreasonable–indeed, it would be preposterous–to assume that these defendants would have participated in an event which involved a work of art which was inauthentic.

300.  Defendants are also well aware that the Stage Set is an authentic work of art by Calder, because some of them know that defendant Alexander S.C. Rower had stated privately

to plaintiff, and then publicly to the press, that the defendant Foundation was acknowledging the authenticity of the Stage Set.

301.  Defendants also posted on the defendant Foundation's website that the Stage Set was authentic, and then removed that statement.

302.  Defendants have willfully and maliciously refused to authenticate the Stage Set.

303.  That refusal is tantamount to a false designation of the nature, characteristics, qualities, and origin of the Stage Set.

304.  Defendants have consistently, as early as 1998 and as recently as May 2013, informed any and all potential purchasers of the Stage Set, either by affirmative statements or by silence and refusal to respond, that it was not a genuine Calder, and refused to authenticate it so that it could be sold.

305.  Those potential purchasers or consignors included the museums named above in paragraphs 106, 114 and 116,  and Sotheby's and Christie's auction houses.

306.  These museums, and Sotheby's and Christie's, are highly regarded participants in the art market, and, because of their central importance in that market, their refusal to deal with plaintiff has become widely known and disseminated.

307.  Defendants have a consistent policy of disparaging plaintiff's Stage Set by denying its authenticity whenever it is approached by a potential buyer.

308.  Defendants' refusal to authenticate the Stage Set is part of a pattern of an organized and consistent campaign to control, and to prevent plaintiff from entering, the relevant market, namely the market for Calder artworks.

309.  As a direct result of defendants' actions, there are many potential purchasers, and potential lenders, who have refused to deal with plaintiff.

310.  As a direct result of defendants' willful and malicious and repeated refusals, plaintiff has suffered economic damage.

311.  This is an exceptional case within the meaning of 15 U.S.C. § 1117(a), in that defendants' continued and repeated refusals to authenticate plaintiff's Stage Set are made in bad faith, with malice intended to harm plaintiff, and without any basis in fact.

312.  Plaintiff is entitled to damages in an amount to be determined by a jury and the Court, plus a reasonable attorney's fee.

THIRD CLAIM
(Donnelly Act; New York General Business Law § 340 *et seq.*)

313.  Plaintiff re-alleges paragraphs 1 through 278.

314.  The relevant product market is as set forth in paragraphs 164-203.

315.  The nature and effects of the conspiracy are as set forth in paragraphs 241-276.

316.  The intent and effect of this conspiracy is to restrain trade in the relevant product market.

317.  The above-described conduct constitutes one or more violations of the Donnelly Act, New York General Business Law § 340 *et seq.*.

318.  Plaintiff is entitled to damages in an amount to be determined by a jury and the Court, such damages to be trebled pursuant to § 340 subd. 5 of the New York General Business Law, plus a reasonable attorney's fee.

FOURTH CLAIM
(Property Disparagement; Special Damages)

319.  Plaintiff re-alleges paragraphs 1 through 278.

320.  Within one year preceding the commencement of this action, one or more of the defendants have made statements to other persons to the effect that the Stage Set is not a genuine work of art by Alexander Calder.

321.  Said statements are false and defamatory, and constitute product disparagement.

322.  Said statements were made with malice, in that defendants know full well that the Stage Set is a genuine work of art by Alexander Calder, because they have previously acknowledged its authenticity.

323.  Additionally, some of the defendants were personally involved in the production of the Stage Set and the 1977 memorial performance.

324.  Defendants intentionally made said statements knowing that the statements were false.

325.  Alternatively, defendants' refusal to confirm the authenticity of the Stage Set, and its silence with respect thereto, are tantamount to a positive statement that the Stage Set is not an authentic Calder artwork.

326.  Plaintiff has suffered special damages as a result of defendants' false statements, in that potential purchasers have rescinded their firm offers, and other potential purchasers have refused to deal with plaintiff.

-46-

327.   Among the potential museums, institutions, purchasers and lenders who have rescinded their firm offers, or who have broken off discussions with plaintiff or his agents, are those set out in paragraphs 103-123.

328.   Defendants have a firm and well-enforced policy of reactive disparagement against plaintiff, in which they refuse to authenticate the Stage Set, each and every time a potential purchaser requests that they do so.

329.   Defendants have also threatened economic retaliation against anyone who seeks to assist plaintiff in establishing the genuineness of the Stage Set, or in selling it on his behalf.

330.   This policy has existed continuously for more than eight years, and is tantamount to a boycott.

331.   Plaintiff has suffered special damages in the amount of the value of the Stage Set, together with such additional compensatory and punitive damages as may be determined by a jury and the Court.

FIFTH CLAIM
<u>(New York General Business Law § 349)</u>

332.   Plaintiff re-alleges paragraphs 1 through 278.

333.   The actions of the defendants as aforesaid constitute deceptive acts and practices within the meaning of New York General Business Law § 349.

334.   Defendants have falsely, willfully, maliciously and repeatedly stated to potential purchasers and others that plaintiff's Stage Set is not an authentic work by Calder.

335.   The individual defendants are charged with the management of the defendant Foundation, which is a tax-exempt private foundation, supposedly engaged in the advancement

of the reputation and artistic heritage of their namesake, including the advancement of scholarship and the compilation of a *catalogue raisonné*.

336.  By virtue of that status and purpose, the defendants' activities are imbued with a public interest.

337.  In addition to injuring the plaintiff, the defendant's actions have caused harm to the public interest.

338.  The harm to the public interest is that the actions of the defendants have interfered with the proper orderly functioning of the market for Calder artworks.

339.  The further harm to the public interest is that the willful manipulations engaged in by defendants have lessened the scholarly value of the *catalogue raisonné*, inasmuch as it cannot be relied upon to be an accurate and objective record of authentic Calder artworks.

340.  The further harm to the public interest is that the individual defendants are using the defendant Foundation's tax-exempt status to advance their private pecuniary interests.

341.  The actions of the defendants have created artificial scarcity, have inflated prices, have caused the destruction of the value of property owned by plaintiff, and by persons other than plaintiff, and have created a climate of fear in the market for Calder artworks.

342.  Defendants' actions constitute deceptive acts and practices in the conduct of a business, trade or commerce, and in the furnishing of any service.

343.  Plaintiff is entitled to recover his actual damages, plus a reasonable attorney's fee.

## DEMANDS FOR RELIEF

WHEREFORE, plaintiff demands relief as follows:

On his First Claim, damages in an amount to be determined by a jury and the Court, such damages to be trebled pursuant to § 4 of the Clayton Act, plus a reasonable attorney's fee;

On his Second Claim, damages in an amount to be determined by a jury and the Court, plus a reasonable attorney's fee;

On his Third Claim, damages in an amount to be determined by a jury and the Court, such damages to be trebled pursuant to § 340 subd. 5 of the New York General Business Law, plus a reasonable attorney's fee;

On his Fourth Claim, damages in the amount of the value of the Stage Set, together with such additional compensatory and punitive damages as may be determined by a jury and the Court;

On his Fifth Claim, damages in an amount to be determined by a jury and the Court, plus a reasonable attorney's fee;

Together with interest, the costs and disbursements of this action, and such further relief as may be just.

Dated: New York, New York
      May 12, 2014

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff
285 West Fourth Street
New York, New York 10014
212.633.0123
altmanlaw@earthlink.net
artesq@earthlink.net

-49-